# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHY CORONADO, et al., | CASE NO. CV-F-03-5874 LJO |
| Plaintiff, | **ORDER ON DEFENDANTS'**<br>**MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| COUNTY OF MADERA, et al., | |
| Defendant. | |

Defendant County of Madera, Correctional Managed Care ("CMC") and defendant Debbie Massetti, R.N. move for summary judgment or in the alternative summary adjudication against plaintiffs Kathy Coronado, Ruben Coronado, individually and as Administrators of the Estate of Chad Coronado. Plaintiffs filed two *ex parte* applications seeking continuance of the motion for summary judgment. In the first *ex parte* application, plaintiffs sought an extension of time to file an opposition and argued as grounds: the confusion as to the Court's department and date of hearing, the lack of proper filing by defendants, and the lack of prejudice to defendant if the extension is granted. This Court granted the *ex parte* application and continued the hearing date from March 10, 2006 to April 7, 2006. Thereafter, on the date plaintiffs' opposition was due to be filed for the continued motion, plaintiffs filed a second *ex parte* application. Plaintiffs argued for a second continuance based on need for additional discovery, among other grounds. The Court denied this *ex parte* application on the grounds that plaintiffs had not carried their burden of showing how the additional discovery will create a genuine issue of fact. (Doc. 80.) The hearing was vacated and motion was taken under submission. Having read the moving papers and opposition, the Court orders as follows.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs are the heirs of Chad Coronado who passed away on June 26, 2002 at the age of 27. Plaintiff was an inmate at the Madera County Jail and was transferred on June 23, 2002 to the Madera Community Hospital. He underwent a surgical procedure to remove a cyst and while there, was discovered to have a high glucose level. He was diagnosed with previously undiagnosed diabetes by Dr. Walters with "Type II Diabetes Mellitus."

Chad Coronado was returned to Madera County Jail Infirmary where he came under the care of Nurse Debbie Massetti and CMC. CMC contracted with the County of Madera to provide nursing staff to the inmates at the Madera County Jail. (Third Amended Complaint ¶13.) The diagnosis of Type II Diabetes Mellitus was forwarded to the jail, but the laboratory test results were not. Nurse Massetti drew blood from Chad Coronado and sent it to the lab for testing, which has a turnaround time of 2-3 days. (Massetti Decl. ¶3.) She counseled him on his diet in light of the disease. (Massetti Decl. ¶3.) She and the staff followed the instructions for his care as ordered by Dr. Walters: finger sticks to check blood sugar were done regularly, his diet was modified to counter nausea, and insulin was given to help control his blood sugar levels. (Massetti Decl. ¶6.)

On June 26, 2002 at 1:00 a.m., Nurse Massetti received a call that Chad Coronado's blood sugar was over 400. (Massetti Decl. ¶3.) She ordered insulin and ordered that his blood sugar be check every couple of hours. She was off duty, but went to the Jail and started an IV and his vital signs were within normal limits. She left for home but returned at 7:00 a.m. due to her concern about him. She checked his chart and ordered an ambulance to take him to the hospital. Chad Coronado died later that day at the hospital.

Plaintiffs allege two claims. Plaintiffs allege that defendants were deliberately indifferent to Chad Coronado's dangerous medial condition in violation of his Eighth Amendment and Due Process rights. Plaintiffs also allege that CMC and Debbie Massetti were negligent in their care and treatment of decedent while incarcerated in the Madera County Jail.

**ANALYSIS & DISCUSSION**

**A.    Summary Judgment Standard**

Initially, it is the moving party's burden to establish that there is "no genuine issue of material

1  fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©; *British*
2  *Airways Board v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978), *cert. denied*, 440 U.S. 981 (1979).
3  Rule 56(e) requires the party against whom the motion is made to "set forth specific facts showing that
4  there is a genuine issue for trial." Absent such a showing, a properly supported motion for summary
5  judgment may be granted if the court finds it appropriate." *Nilsson, Robbins, et al v. Louisiana*
6  *Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

7      The court cannot grant the motion merely because plaintiff has failed to oppose the motion or
8  failed to submit a statement of disputed facts. *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950 (9th Cir.
9  1993). Rule 56(e) requires the party against whom the motion is made to "set for specific facts showing
10 that there is a genuine issue for trial." Absent such a showing, <u>a properly supported</u> motion for summary
11 judgment may be granted if the court finds it appropriate. *Nilsson, Robbins, et al v. Louisiana Hydrolec*,
12 854 F.2d 1538, 1545 (9th Cir. 1988) (emphasis added). The moving party still has to meet its burden of
13 proof. *In re Rogstad*, 126 F.3d 1224, 1227 (1997) (summary judgment is not an acceptable sanction for
14 violation of a local rule.)

15     But that burden is met simply by "showing-- i.e., pointing out to the District Court--that there
16 is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S.
17 317, 325, 106 S.Ct. 2548 at 2554 (1986). Plainly, a conclusory assertion that the opposing party has no
18 evidence is insufficient: "It is not enough to move for summary judgment . . . with a conclusory assertion
19 that the (opposing party) has no evidence to prove his case." *Celotex Corp. v. Catrett, supra*, 477 U.S.
20 at 326, 106 S.Ct. at 2555 (J. White, concur. opn.) The moving party must identify the specific issue or
21 issues on which it claims the opposing party has no supporting evidence, and demonstrate the absence
22 of such evidence: "It is enough for the movant to bring up the fact that the record does not contain such
23 an issue and to identify that part of the record which bears out his assertion." *Mt. Pleasant v. Associated*
24 *Elec. Co-oP*, 838 F.2d 268, 273 (8th Cir. 1988); *Russ v. International Paper Co.*, 943 F.2d 589, 592
25 (5th Cir. 1991).

26     The court, however, has no duty to search the record, *sua sponte*, for some genuine issue of
27 material fact; the court may rely entirely on the evidence of the moving party. *Guarino v. Brookfield*
28 *Township Trustees*, 980 F.2d 399, 403 (6th Cir. 1992). If the motion is based on deposition testimony,

the court may rely exclusively on portions highlighted by the moving party and need not comb the deposition to discover conflicting testimony. *Guarino v. Brookfield Township Trustees, supra*, 980 F.2d at 403. The court is not obligated to consider matters not specifically brought to its attention. Thus, it is immaterial that helpful evidence may be located somewhere in the record. The opposition must designate and reference specific triable facts. *Frito-Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (DC Cir. 1988). Inferences drawn from the evidence, however, must be viewed in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 2077 (1992).

**B.    Deliberate Indifference Standard**

    **1.    Two Prong Test - the Objective Prong**

Plaintiffs allege a cause of action for deprivation of a constitutional right by deliberate indifference to a serious medical need in violation of the Eighth Amendment as applied to the states via the Fourteenth Amendment. Denial of medical attention to prisoners constitutes an Eighth Amendment violation if the denial amounts to deliberate indifference to serious medical needs of the prisoners. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976). Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying a prisoner needed medical care only if the person "knows of and disregards an excessive risk to inmate health and safety." *Id.*

The "deliberate indifference" standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980), *citing Estelle*, 429 U.S. at 105-06. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. at 106; *see also Anderson v. County of Kern*, 45 F.3d 1310, 1316 (9th Cir. 1995). Even gross negligence is insufficient

to establish deliberate indifference to serious medical needs. *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

Considering the evidence in light most favorable to the plaintiffs, the deprivation of medical care meets the objective prong due to the death of Chad Coronado. In fact, defendants do not argue that the objective prong of the deliberate indifference test has failed to be met. (Moving papers p.7-8).

**2. Subjective Prong of Deliberate Indifference**

Rather, defendants argue that there is no question of fact as to the second prong of the deliberate indifference test.

The second prong involves the subjective component. The prison official must act with a "sufficiently culpable state of mind," which entails more than mere negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." *Id*.

In *Farmer v. Brennan*, the Supreme Court distinguished the test for "deliberate indifference" established in *City of Canton* from the test for "deliberate indifference" required for culpability under the Eighth Amendment in prison conditions cases. The Court noted:

> "It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective. *Canton's* objective standard, however, is not an appropriate test for determining the liability of prison officials under the Eighth Amendment as interpreted in our cases." *Farmer v. Brennan*, 511 U.S. at 841.

The Eighth Amendment's deliberate indifference standard looks to the subjective mental state of the person charged with violating a prisoner's right to medical treatment which does not impose liability unless a person has actual notice of conditions that pose a substantial risk of serious harm. *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1188, n.8 (9th Cir. 2002) (comparing the "deliberate indifference" standard for Eighth Amendment violations with regard to medical needs with the "deliberate indifference" standard to determine when a municipality's omissions expose it to liability for the federal torts committed by its employees.), *cert. denied*, 537 U.S. 1106 (2003). In order to know of the excessive risk, it is not enough that the person merely "be aware of facts from which the inference

1  could be drawn that a substantial risk of serious harm exists, <u>he must also draw that inference</u>." *Gibson*,
2  290 F.3d at 1188 (Emphasis added). If a person should have been aware of the risk, but was not, then
3  the person has not violated the Eighth Amendment, no matter how severe the risk. *Id.* "[T]he deliberate
4  indifference doctrine contains a heightened foreseeability requirement, this requirement differs from the
5  traditional negligence foreseeability requirement only insofar as deliberate indifference requires the
6  defendant to be *subjectively* aware that *serious* harm is likely to result from a failure to provide medical
7  care." *Gibson*, 290 F.3d at 1193 (Emphasis in original).

8  In *Gibson*, Gibson, a manic depressive, suffered a heart attack and died while in custody.
9  Gibson's wife and children sued under §1983 against the County and individual officers. The trial court
10 granted summary judgment as to all defendants. The Ninth Circuit found triable issues of fact as to
11 whether the County, through its agent, the jail nurse, may have been deliberately indifferent. The Ninth
12 Circuit held that the jury could find that the nurse knew that Gibson was in the throes of a manic state
13 on the basis of three facts: the nurse had medical training, he knew that Gibson was exhibiting behavior
14 consistent with mental illness, and he knew that Gibson possessed psychotropic medication "that would
15 stabilize somebody." *Gibson*, 290 F.3d at 1194. The nurse, however, was not a defendant. As to the
16 jail officers, who were defendants, the Court affirmed the grant of summary judgment that the officers
17 were not deliberately indifferent to the detainee's medical needs: all the deputies at the jail knew about
18 Gibson's mental condition was what they could observe of his behavior. "Although several remarked
19 on his peculiar mood swings and dramatic shifts from combativeness to compliance, there is no evidence
20 that any of them actually knew that this behavior connoted serious, treatable mental illness." *Id.* at 1196-
21 97. The Court found this did not raise a triable issue of fact.

22 In a more recent Eighth Amendment case, on more extreme facts, the Ninth Circuit reversed a
23 summary judgment that had found the officers not deliberately indifferent. In *Lolli v. County of Orange*,
24 351 F.3d 410 (9th Cir. 2003), a diabetic was arrested. At the time of his arrest, he informed the arresting
25 officer and the jail screening nurse he was a diabetic, felt ill and needed to eat. The Ninth Circuit
26 phrased the issue as, "The question, then, is whether Lolli presented evidence from which a reasonable
27 jury could conclude that any of the individual officers knew of and were deliberately indifferent to this
28 substantial risk of serious harm Lolli faced if not properly treated." *Id.* at 420. The Ninth Circuit

concluded that Lolli presented such evidence:

> "The record supports the inference that the officers who either were near Lolli in the holding cell or were present when Lolli was carried to the medical observation cell were on notice of Lolli's diabetic condition and his need for food. Lolli testified that when Deputy Walker entered the holding cell at around midnight, Lolli told Walker that he was diabetic, was feeling very sick, had been promised food that was long overdue and asked Walker to find out what happened to his snack. He also testified that "other deputies" were standing near Walker when he spoke; the record reveals that of the named defendants, Deputy Kent was near Deputy Walker at the time Lolli allegedly made this statement. Lolli also testified that while deputies were carrying him to the medical observation cell, he told them that he was a diabetic and all he needed was some food. The record shows that Sergeant Toledo and Deputies Walker, Richards, Finlay and Baum carried or accompanied those who carried Lolli to the medical observation cell. In sum, the evidence Lolli has presented-- although controverted by the deputies' denials that Lolli told them that he suffers from diabetes and required food--could establish that Deputies Walker, Kent, Finlay, Richards and Baum and Sergeant Toledo knew that Lolli was diabetic and needed food." *Id.* at 420.

The next part of the Ninth Circuit's analysis was whether there was evidence that the officers inferred from this information that Lolli was at serious risk of harm if he did not receive the food. The Court concluded that there was no direct evidence that any of these named defendants knew of this risk of harm. The Court, nonetheless, found the circumstantial evidence was sufficient.

> "However, the officers' indifference to Lolli's extreme behavior, his obviously sickly appearance and his explicit statements that he needed food because he was a diabetic could easily lead a jury to find that the officers consciously disregarded a serious risk to Lolli's health."

The Court considered evidence that:

> "[Lolli] also testified that he was on his feet and spoke up to the deputies as soon as they entered the cell, telling them of his deteriorating condition and asking for food, and even after he had been cuffed and was being carried away he continued to do so, pleading 'My God, ... I'm a diabetic, and all I needed was food, all I need is some food.' The urgency of his protestations about his diabetes and need for food--protestations he persisted in making even after they allegedly brought on a serious beating--further supports the inference that the officers knew of the risk of harm Lolli faced. A jury, therefore, could reasonably infer that the officers who knew of Lolli's diabetic condition and need for food also knew of the risk of harm that he faced if denied medical attention." *Id.* at 421.

Based on these facts, the Court found that plaintiff had raised triable issues of fact. The Court, however, affirmed dismissal of the officer who did not hear of Lolli's diabetic condition.

7

Here, the evidence establishes that Chad Coronado was diagnosed with Type II Diabetes Mellitus. The discharge orders from the hospital stated that Chad Coronado was to be followed by Dr. Walters in the clinic at the jail. (Doc. 76, Plaintiffs' Undisputed fact no. 5.) Dr. Walters wrote the discharge orders requesting finger sticks to check blood sugar, and a 2400-calorie American Diabetic Association diet as tolerated. (Doc. 76, Plaintiffs' Undisputed fact no. 5.) When Chad Coronado returned to the Madera County Jail Infirmary, he came under the Care of Nurse Debbie Massetti and CMC. Nurse Massetti states, and there is no evidence to the contrary, that the care provided was in strict compliance with what Dr. Walters had ordered. She and the nursing staff administered finger sticks to check blood sugar, ordered a diet modified to counter nausea, and gave insulin to help control his blood sugar when it became elevated. (Massetti Decl. ¶¶3, 4, and 6, respectively.)

Defendants submit the declarations of Peter Singer, M.D., Michele Groff, R.N., and Debbie Massetti, to show that the defendants CMC and Nurse Massetti were not aware that Chad Coronado suffered from Diabetic Ketoacidosis. Plaintiffs do not object to the form or substance of the declarations.

Michelle Groff is a Registered Nurse licensed to practice in California. She states she reviewed all of the medical records. Michele Groff states that "no one informed the nursing staff at Madera County Jail (Correctional managed Care) that Mr. Coronado could even possibly be suffering from Diabetic Ketoacidosis," and provides a medical opinion that "DKA is not a typical complication from Diabetes Mellitus Type II, particularly with newly diagnosed persons." (Groff Decl. ¶9.)

Defendants also submit the declaration of Peter Singer, M.D. who is California licensed and board certified in Internal Medicine. He obtained his medical degree in 1965 and currently teaches at USC School of Medicine. While he says he attaches his CV, it is not attached; but there is no objection to his testimony. He reviewed the medical records and the declarations of Nurse Debbie Massetti and nursing expert Michele Groff, R.N. He states that Diabetic Ketoacidosis is not a typical complication:

> "[N]o one informed the nursing staff at Madera County Jail (Correctional Managed Care) that Mr. Coronado could even possibly be suffering from Diabetic Ketoacidosis (DKA), which is not a typical complication from Diabetes Mellitus Type II, particularly with newly diagnosed persons."
> (Singer Decl. ¶7.)

It is undisputed that Chad Coronado died of Diabetic Ketoacidosis (DKA). The evidence establishes that DKA is not a typical complication from Diabetes Mellitus Type II, particularly with

newly diagnosed persons. (Singer Decl. ¶7, Groff Decl. ¶9.) It is not disputed that CMC and Debbie Massetti followed the instructions from the treating physician regarding the care to be provided and had no reason to suspect any other condition. Chad Coronado was cared for in a way consistent with instructions given by Dr. Walters and in a manner appropriate for Diabetes Mellitus Type II. (Singer Decl. ¶¶6-7;Groff Decl. ¶9.) Nurse Massetti was called one evening when Chad Coronado had spit up jello; and she instructed staff to provide him with an injection to control nausea. Nurse Massetti returned in the late-evening early morning hours of June 25 to check on Chad Coronado's vital signs. His vital signs were within normal range. On June 26, 2002 at 1:00 a.m., Nurse Massetti received a call that Chad Coronado's blood sugar was over 400. (Massetti Decl. ¶3.) She ordered insulin injection and ordered that his blood sugar be check every couple of hours. She was off duty, but went to the Jail and started an IV and his vital signs were within normal limits. She left for home but returned at 7:00 a.m. due to her concern about him. She checked his chart and ordered an ambulance to take him to the hospital. Nurse Massetti reviewed Chad Coronado's medical record at least daily and communicated with the nursing staff frequently. She attended to him in the middle of the night and during her off hours. She ordered insulin and ordered that he be monitored continuously. His blood sugar and other vital signs were monitored into the morning of June 26, 2002.

There is no evidence that the defendants knew Chad Coronado was in fact suffering from not only Diabetes Mellitus Type II, but DKA as well. Plaintiffs do not present any evidence that the jail medical nursing staff knew that Chad Coronado was suffering from Diabetic Ketoacidosis and failed to treat him. Therefore, plaintiffs have failed to raise a triable issue of fact that the nursing staff "knew of and disregarded" an excessive risk to Chad Coronado's health.

**C.   State Law claim for wrongful death**

California Code of Civil Procedure § 377.60 establishes a separate statutory cause of action in favor of specified heirs of a person who dies as a result of the 'wrongful act or neglect' of another. Under a wrongful death cause of action, the specified heirs are entitled to recover damages on their own behalf for the loss they have sustained by reason of the bodily injury victim's death. *See Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 105, 11 Cal.Rptr.2d 468, 478 (1992). Although it is a statutorily-created action, a wrongful death suit predicated on negligence must still contain the elements

1  of actionable negligence. *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th at 105. The state law
2  claim for negligence requires proof of (1) the duty, (2) breach, (3) causal connection, and (4) actual loss.
3  *Id., accord Mattco Forge, Inc. v. Arthur Young & Co.,* 52 Cal.App.4th 820, 833 (1997).

In diagnosing and treating patients, doctors must exercise the reasonable degree of skill, knowledge and care ordinarily exercised by doctors under similar circumstances in their professional community. The standard of skill, knowledge and care prevailing in a medical community is ordinarily a matter within an expert's knowledge. Expert opinion, therefore, is required to determine the probability of negligence where a medical process is not a matter of common knowledge. *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th at 106. Expert testimony is required to decide the issues raised in the complaint regarding the applicable standard of care. *Osborn v. Irwin Memorial Blood Bank*, 5 Cal.App.4th 234, 273 (1992).

Defendants rely upon the declarations of Peter Singer, M.D., Michele Groff, and Debbie Massetti, to show that the care the treatment by defendants was at all times within the standard of care.

Michele Groff states that Dr. Walters wrote the discharge orders, requesting fingerstick blood sugars, and 2400-calorie American Diabetic Association (ADA) diet as tolerated. (Groff Decl.¶4.) She notes that, "There were no Discharge Orders in the records for follow-up sugars; further laboratory studies; or antihyper glycemic agents to treat his elevated blood sugar." (Groff Decl.¶4.) She states that based on the Discharge Orders, Nurse Massetti and the staff placed Mr. Coronado on a care plan that included liquids; diabetic diet; and directed the Correctional Managed Care staff to perform fingerstick blood sugars and parameters to treat the elevated blood sugars and insulin. (Groff Decl. ¶5.) She opines that "Nurse Massetti did not fail any duty to Mr. Coronado," and that it was reasonable that Nurse Massetti did not suspect DKA in a patient newly diagnosed with Diabetes Mellitus Type II." (Groff Decl. ¶¶9, 10.)

Defendants also rely upon the declaration of Dr. Singer. He states that the nursing care provided was within the standard of care:

> "the care provided to Mr. Coronado by Nurse Massetti and CMC was within the standard of care and appropriate for a patient recently diagnosed with Type II Diabetes Mellitus. Mr. Coronado may have died from complications relating to DKA, however, there is no evidence of indifference or breach of duty by Nurse Massetti or CMC which led to

10

this tragic situation.  In my opinion Nurse Massetti and CMC provided reasonable and appropriate nursing care at all times to Mr. Coronado, giving what they were told he was suffering from." (Singer Decl. ¶8.)April 6, 2006

The evidence does not demonstrate that the nursing staff at Madera County Jail was informed that Mr. Coronado could possibly be suffering from Diabetic Ketoacidosis.  Diabetic Ketoacidosis is not a typical complication from Diabetes Mellitus Type II.  (Singer Decl. ¶7, Groff Decl. ¶9).  The undisputed evidence is that the care provided was in accordance with the standard in the community.  (Singer Decl. ¶8, Groff Decl. ¶11 and Massetti Decl.) There is no contrary evidence.  Accordingly, there is no triable issue of fact on this claim.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment by defendant County of Madera, Correctional Managed Care and defendant Debbie Massetti, R.N. is GRANTED.

IT IS SO ORDERED.

**Dated:   April 6, 2006**                               **/s/ Lawrence J. O'Neill**
b9ed48                                                          UNITED STATES MAGISTRATE JUDGE